BROS INCORPORATED, Appellant,

v.

W. E. GRACE MANUFACTURING COMPANY and William E. Grace, Appellees.

W. E. GRACE MANUFACTURING COMPANY and William E. Grace, Appellants,

v.

BROS INCORPORATED, Appellee.

No. 19672.

United States Court of Appeals
Fifth Circuit.

July 3, 1963.

Joseph H. Schley, Dallas, Tex., Andrew E. Carlsen and Douglas L. Carlsen, Minneapolis, Minn., Schley & Schley, Dallas, Tex., of counsel, for appellant.

Howard E. Moore, Dallas, Tex., Channing L. Richards, Charlotte, N. C., for appellees.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This litigation bearing service stripes from its now second appearance here, Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1958, 261 F.2d 428, as well as two trips to the 6th Circuit, Gibson-Stewart Co. v. Wm. Bros Boiler & Mfg. Co., 6 Cir., 1959, 264 F.2d 776, cert. denied, 1959, 360 U.S. 929, 79 S.Ct. 1448, 3 L.Ed. 2d 1544, Wm. Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., 6 Cir., 1963, 312 F.2d 385, and an oblique visit more recently to the 8th Circuit, Bros, Inc. v. Browning Mfg. Co. & Shovel Supply Co., 8 Cir., 1963, 317 F.2d 413, aff'g D.C. Minn.1962, 134 U.S.P.Q. 231, deals with the validity (and infringement) of Bros Patent No. 2,610,557. The main appeal by the Patentee (Bros Incorporated) presents simple routine accounting questions. The cross appeal of the Infringer (W. E. Grace et al.), more complex and intricate, presents difficult problems concerning the extent to which courts within the 5th Circuit may properly re-examine under equitable doctrines an earlier judgment entered in Texas on principles of res judicata on the basis of an Ohio judgment sustaining validity of the patent which was subsequently affirmed by the 6th Circuit under orders denying efforts to reopen the case to prove facts subsequently ascertained by the Minnesota court to establish invalidity of the patent because of prior domestic publication.

Hearkening as we should to the principle epitomized in Justice Story's apothegm that "It is for the public in-

terest and policy to make an end to litigation * * * " so that " * * * suits may not be immortal, while men are mortal." Ocean Ins. Co. v. Fields, 18 Fed. Cas. 532, we nonetheless conclude that before the curtain falls on this juridical drama, there must be another act.

## The Patentees Appeal

### I.

The questions presented on the main appeal are both simple and substantially meritorious. They all have to do with ascertaining the correct amount of damages occasioned by the infringement. By our prior decision, Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1958, 261 F.2d 428, and solely on the basis of the Ohio judgment under principles of res judicata,[1] we affirmed the Texas District Court's finding of validity and infringement as well as the order granting a permanent injunction against further infringement. But as the Court had anomalously denied damages, we reversed and remanded that part of the decree for proper accounting.

After remand a Master was appointed who heard extensive evidence both documentary and from live swearers. The Master found that 78 infringing machines had been sold, and that the Patentee would have made a profit of at least $2,000 per machine. On this he awarded a recovery of $156,000. Each party excepted to the report, but only those of the Patentee are brought forward here. On the exceptions, the Court substantially confirmed the underlying findings of the Master, but differed radically in one significant respect. The Judge, on a record which showed that there were two other Texas concerns selling these compactors for use in highway construction and similar work, reasoned that had not the Infringer wrongfully appropriated and sold the patented machines, ⅔rds of them would probably have been sold by these two competitors. Hence the Court reduced the award by ⅔rds to $52,000.

Appealing from that action, the Patentee asserts a number of other less decisive complaints. The next two are interrelated. They involve, first, the question of the time of notice of infringement and, second, the number of machines to be accounted for. A further complaint concerns the standard for computing damages—whether the Patentee's rather than the Infringer's probable profits. And the last three deal with the interest rate, attorney's fees, and equal division of costs as fixed by the trial Court.

The basic complaint may be quickly handled. The Master with ample basis found that had not the Infringer sold the machines, the Patentee would. Neither before the trial Court nor here has the Infringer carried the burden of showing that such finding is clearly erroneous. F.R.Civ.P. 53(a), (e) (2). Indeed, the trial Court's approach is a novel and startling one. The substantial sales made prove a demand. As a matter of economics, had the two other concerns waiting in the wings been as formidable as the Judge must have thought, we are unable to see why, on this theory, the Infringer likewise would not have lost out to these competitors. The consequence of the holding is strange. In effect it is that an admitted infringer who has made substantial profits from purloining another's patent is not made to account for his acknowledged acts because had he not poached, another would or, at any rate, sales of similar products would have been made, not by the patent owner, but by others. To avoid such an anomaly, we therefore restore the Master's finding that the Infringer is liable for all of the machines sold by it during the critical period.

The next two contentions center around the construction of 35 U.S.C.A.

---

1. Gibson-Stewart Co. v. Wm. Bros Boiler & Mfg. Co., 6 Cir., 1959, 264 F.2d 776, aff'g 116 U.S.P.Q. 138, cert. denied, 1959, 360 U.S. 929, 79 S.Ct. 1448, 3 L.Ed.2d 1544.

§ 287.[2] The Master, confirmed by the District Court, held that damages would commence as of June 24, 1954, the date of the filing of the Ohio suit. In doing so on a record which by stipulation included the Master's hearing in the Ohio case, the Court below rejected the holding of Judge Jones (modifying his Master) that time began on June 10, 1953, the date of the first proper marking of the machines.

Section 287 provides that the patentee "may give notice to the public that the [article] is patented * * * by fixing thereon the word 'patent' * * *." The statute further provides that "[i]n the event of failure so to mark, no damages shall be recovered by the patentee * * * except on proof that the infringer was notified of the infringement and continued to infringe thereafter * * *." The Master below constructed an elaborate theory on which he sustained the Infringer's contention that there having been a failure properly to mark from the date of issuance of the patent (September 16, 1952) down to June 10, 1953, the Patentee had lost forever the constructive notice protection afforded by marking under § 287. As did the 6th Circuit,[3] we concur in Judge Jones' decision as the one "supported by the better reasoning." The Court points out that there is "* * * nothing in the statute requiring marking or notice within any period after issue as a condition for recovery of damages for infringement * * *"

and the only "penalty for failure * *" either to mark or serve notice is "limited to denial of damages for infringement at any time prior to compliance with the requirements of the statute." 312 F.2d 385, 386.

While we reject the effective date selected below, other findings on substantially uncontradicted evidence enable us by a process of simple computation to fix the number sold at 94 machines subsequent to June 10, 1953.

Little need be said about the next contention that the Master erred either in calculating damages on the basis of profits lost by the Patentee, rather than those made by the Infringer or, in any event, in rounding them off to $2,000 per machine rather than $2,164.62. The Patentee insists that had the Master applied the legal standard of the profits made by the Infringer, other portions of the Report demonstrate that the allowance would have been fixed at $2,914.32 per machine. As the Patentee views it, since this and other Courts have allowed damages based upon the infringer's profit,[4] or the profits the patentee would have made,[5] the choice is open to the patentee who will obviously take the greater. But this, much like the criticisms on the computation of the dollar amounts, is to ignore the subtle judicial function in ascertaining damages. The statute, 35 U.S.C. § 284, allows considerable latitude. The Master carefully weighed all factors and by a well reasoned analysis came out with a figure per unit which was fair.

2. Act of July 19, 1952, c. 950, § 1, 66 Stat. 813, amending former 35 USCA § 49, R.S. 4900, Act of February 7, 1927, c. 67, 44 Stat. 1058.

3. Wm. Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., 6 Cir., 1963, 312 F.2d 385.

4. Graham v. Jeoffroy Mfg., Inc., 5 Cir., 1958, 253 F.2d 72, 74. "* * * the profits made by the infringer from his improper use of the infringing device may be the measure of the damages suffered, even though the statute does not prescribe that profits are to be recovered as such."

Affirming Judge Jones' confirmation of the Ohio Master's findings, the 6th Circuit approved the use of the infringer's "gross profits on the infringing machines as the measure of recoverable damages," especially since the infringer did not produce relevant records and "has shown no good reason and * * * no satisfactory accounting figures why the gross profits should not be taken into consideration as a measure of damages, in the absence of any other suitable measure." Wm. Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., 6 Cir., 1963, 312 F.2d 385, 386.

5. Livesay Window Co. v. Livesay Industries, Inc., 5 Cir., 1958, 251 F.2d 469, 471.

As did the District Judge, we likewise approve it.

 This brings us to some tag ends. Under the circumstances of this case, we see no error in specifying the interest rate at 4%, rather than 6%, the usual Texas rate. As to attorney's fees, it may be that when the Judge (without prior recommendation of the Master) allowed $7,500 he was doing so in relation to the amount of damages finally allowed ($52,000). On such an approach, attorney's fees would ordinarily be increased three times. But in view of the unusual complications of this case, which we later discuss, we are hardly in a position to make any sound revision. We do think, however, that there is no basis at all for dividing the costs of the reference, including the Master's fees. Nothing about the position asserted by the Patentee in the reference proceedings or the outcome in the Master's report reasonably calls for the imposition of any of these charges on it. Except for the relative minor dispute concerning the time for commencement of damages, the Patentee sustained all of its contentions. Nothing the Patentee did either precipitated the necessity for the reference, nor did it prolong it. Indeed, as between the two the criticism on that score if any is made should more properly be directed at the Infringer whose inaccurate, inadequate, incomplete or nonproduced records brought about so much of the confusion. As flexible as a court must be on matters of unusual cost, cf. Yacht "Mary Jane" v. Broward Marine, Inc., 5 Cir., 1963, 313 F.2d 516, no satisfactory basis appears for dividing these costs.

### The Infringer's Cross Appeal

### II.

While the main appeal presented simple issues of easy resolution, this is far from the case as to the cross appeal. It is complex and difficult. It is difficult because it is again the clash between the strong public policy of finality and repose on the one hand and the lofty appeal of intrinsic justice on the other. Adding greater complexity is the subject of the litigation—the patent monopoly with its overriding public interest. And sustaining the chain reaction which produces more and more problems in the course of this juridical fission, are divisive elements of res judicata, geography, inter-circuit insularity, and at least the possibility that when the last gong is rung, the patent will have been sustained as to this Infringer-cross appellant only.

 The cross appeal is nominally from the final judgment entered on March 9, 1962, fixing damages, costs, etc. which, as modified, we have just affirmed on the main appeal. The error asserted is nominally the failure of the Court to grant the motion for new trial under F.R.Civ.P. 59 filed on March 19, 1962, which the Court denied on April 17, 1962, and as to which Notice of Appeal was nominally given April 23, 1962. We say nominally because this highlights the threshold insistence by the Patentee (cross appellee) that we are wholly without jurisdiction to entertain or consider the substance of the cross appeal. This in turn rests on the contention that this is an attempt to appeal from an order denying a motion for new trial a thing which the cases, often with an uncritical confusion of appealability, reviewability, and the tolling provision of pertinent rules, say may not be done.[6]

---

6. But see Milton v. United States, 5 Cir., 1941, 120 F.2d 794; Atlantic Coast Line R. Co. v. Mims, 5 Cir., 1952, 199 F.2d 582; Kanatser v. Chrysler Corp., 10 Cir., 1952, 195 F.2d 104; 6 Moore, Federal Practice, Par. 59.15, p. 3891 (2d ed. 1952); 3 Barron & Holtzoff, Federal Practice & Procedure, § 1302.1 (Wright ed.1958). "Where the appeal is erroneously taken from the order denying the motion, rather than from the judgment, the sound course undoubtedly is to treat this technical error as harmless, and to consider the appeal as if it were from the judgment,[17.9] though there is some suggestion that in such circumstances the court may consider only those errors which were pointed out in the motion for a new trial." p. 347. Footnote 17.9 cites Atlantic Coast Line R. Co. v. Mims, 5 Cir., 1952, 199 F.2d 582, 583.

We think there is nothing to this jurisdictional challenge. Assuming that the motion is what it says it is—one under F.R.Civ.P. 59, and not (as we later discuss) one which must be regarded as under F.R.Civ.P. 60(b) or an independent equitable proceeding as allowed under 60 (b) [7]—the answer is plain. The time for giving Notice of Appeal from the final judgment dated March 9, 1962, was tolled by the timely filing within ten days of the motion on March 19, 1962, F.R. Civ.P. 59(b); 73(a). On April 17, 1962, the motion was overruled, and on April 23, 1963, written notice of appeal was given.[8]

No question exists that the time for giving notice of appeal was tolled up to April 17. Reading the notice of appeal which was timely given in the spirit which the Rules always require as Foman v. Davis, 1962, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222, so recently reflects, there can be no question as to what the cross appellant desired to bring up for review. Its complaint is that it is now under the burden of a final judgment (then for $52,000) plus a permanent injunction against future infringement. The specification of the order denying the motion under Rule 59 served a double role. First it showed that the notice dated April 23 was timely, i. e., within 30 days. More important, it showed that the final judgment dated March 9 (temporarily suspended for purposes of appeal until April

17) was erroneous for the reasons pointed out in the motion for new trial under Rule 59.

This Court therefore has jurisdiction, and the Patentee's motion to dismiss the cross appeal, carried with the case by prior order, is accordingly overruled.

### III.

Severely capsulated, the basis for the extraordinary motion seeking relief [9] from the judgment sustaining validity [10] and infringement is this. On the eve of the issuance of the mandate by the 6th Circuit, the Infringer discovered through its new (and present) counsel that a printed brochure depicting the machine, describing it rather fully and indicating a specific sales price was publicly distributed at the "Road Show" of the American Road Builders Association held at Chicago in July 1948. If publication were established, it could, or at least might, be decisive, especially in light of the admitted display of the machine itself on the show grounds. Dates are of critical importance since with the patent application being filed November 17, 1949, no patent could validly issue if in fact "the invention was * * * described in a printed publication in this * * * country or in public use or on sale in this country, more than one year prior to the date of the application * * *." 35 U.S.C.A. § 102(b). In other words, if the time was fixed at July 1948 and in a substantive sense it was judicially deter-

---

7. If in reality the motion was one under 60(b), the denial of April 17 was final and appealable. Greenspahn v. Joseph E. Segram & Sons, Inc., 2 Cir., 1951, 186 F. 2d 616, 3 Barron & Holtzoff, Federal Practice & Procedure § 1332, p. 434 (Wright ed. 1958); 7 Moore, Federal Practice, Par. 60.30, p. 334 (2d ed. 1955); cf. Saenz v. Kenedy, 5 Cir., 1950, 178 F.2d 417. If it more properly constitutes an application to this Court for leave to institute a partial retrial under 60(b) or as an independent equitable action, a notice of appeal is not a prerequisite and the matter is properly before us.

8. It stated that Infringers hereby "appeal to the United States Court of Appeals * * * from the Order entered * * * on April 17, 1962, denying the Motion by

Defendants under Rule 59; and hereby petition the aforesaid Court of Appeals to suspend the Final Judgment entered herein on March 9, 1962, and to authorize reopening of the Interlocutory Judgment heretofore entered on February 17, 1958, for the purpose of granting a partial new trial devoted to the issue of statutory invalidity of the patent * * *."

9. For these purposes we use the term broadly without regard to whether the procedural device is, should, or must be under Rule 59, 60(b), independent equitable action either in Texas or Ohio, or both.

10. The money judgment is likewise attacked.

mined that "the invention was * * * described in [the] publication * * *," the patent, no matter how meritorious intrinsically, would be invalid because of a positive statutory infirmity. The matter of *time* and *substantive content* is no longer open to dispute since Judge Nordbye after a full trial in the Minnesota litigation has determined that the patent is invalid by reason of this publication in July 1948. Consequently, the theory concludes, neither the decree in the Texas case nor in the Ohio case on which it rests should be given further effect if— by some appropriate procedure—it is determined in the Texas case as between these parties that the patent is invalid by reason of this prior publication.

By whatever name finally called, it is evident that the Infringer seeks equitable relief. What relief, where and how obtained, its extent and nature, must of necessity be determined by the particular facts. They will illumine what is otherwise a dark and tortuous path.

*IV.*

This too begins in the beginning.[11] In 1954 the Patentee filed the Ohio suit against one of Infringer's distributors. Judgment was entered sustaining validity and finding infringement in December 1957. Appeal was taken to the 6th Circuit. In the meantime the present suit was filed in Texas. On February 17, 1958, summary judgment was entered on the basis of res judicata sustaining validity and infringement. Bros, Inc. v. W. E. Grace Mfg. Co., D.C.Tex., 1958, 158 F.Supp. 786. On November 26, 1958, and prior to decision by the 6th Circuit, we affirmed this basic holding, but modified and reversed for an accounting.[12] Shortly thereafter the 6th Circuit affirmed the underlying Ohio judgment in February 1959.[13] On the very next day following denial of certiorari, the Infringer on June 30 filed a motion to stay and to modify the mandate.

Between that date and November 16, 1959, the Infringer filed two further ap-

11. The factual material comes from our present record as supplemented by that filed with us from the 6th Circuit and the briefs and records filed in the 8th Circuit. Pursuant to our request made on oral argument, the parties by stipulation have filed these papers with us. Urging a stipulation to eliminate questions of authenticity, our letter-order expressly reserved to each of the parties the unrestricted right to contest here or elsewhere either the power of this Court or the propriety of its exercise to obtain and consider such materials. The Infringer urges none. The Patentee objects because "the additional materials * * * are not relevant to any issue in this appeal unless some statute or rule gives the Court jurisdiction over the attempted appeal by the [Infringer] from the District Court's denial of a new trial. We have found no such statute or rule." The Patentee's objection on the ground that we lack jurisdiction was overruled in part II above. Treating this as a request by the Infringer for us to grant leave to file a 60(b) motion, this Court has the right to be fully informed of all that has taken place, not to determine it finally, but to decide whether a 60(b) hearing should be held below. "The hearing conducted by the appellate court

on the petition, which may be filed many years after the entry of the challenged judgment, is not just a ceremonial gesture." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 248, 64 S.Ct. 997, 1002, 88 L.Ed. 1250. In an effort to expedite and end this costly litigation, see 3 Barron & Holtzoff, Federal Practice & Procedure § 1332, p. 437 (Wright ed. 1958), we have no doubt as to the propriety of our considering these materials. Additionally, the motion of April 19, as well as earlier motions in the Texas case, refer specifically to prior actions in the Ohio and Minnesota cases. In determining what we or the Texas District Court can do under a judgment imposed by res judicata, it is appropriate to know what the Ohio Court has done, or might do. In any event we do not undertake finally to evaluate these developments except insofar as they do or do not show probable grounds for further judicial inquiry as to the truth and its legal significance.

12. Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1958, 261 F.2d 428.

13. Gibson-Stewart Co. v. Wm. Bros Boiler & Mfg. Co., 6 Cir., 1959, 264 F.2d 776, cert. denied, June 29, 1959, 360 U.S. 929, 79 S.Ct. 1448, 3 L.Ed.2d 1544.

plications with the 6th Circuit to modify and recall its mandate and one with the District Court requesting stay of accounting.[14] Each of these applications was denied, the last by District Judge Jones on November 16, 1959.

In the meantime on June 8, 1959, a declaratory judgment action was brought in Minnesota.[15] The plaintiffs there, though represented by the same counsel, are not in privity with the Infringer. The Minnesota suit by pretrial discovery and trial has provided the machinery to develop the full facts on prior publication. This was affirmatively disclosed in the several applications made to the 6th Circuit. We need not discuss these applications with annexed affidavits in any great detail. Each set forth factually with a number of contemporary commercial photographs the display of machine No. 1 at the "Road Show" held at Chicago in July 1948. Most important, each attached photostatic copies of the elaborate printed brochure.[16] Annexed affidavits from disinterested witnesses fixed the time as July 1948 (as all parties now seem to agree) even though the moving papers showed that on the initial trial in the Ohio District Court, casual reference as to other matters had erroneously referred to the "Road Show" as occurring in July 1949. It is significant, however, that in the supporting papers for the initial application, specific reference was made to the pretrial orders entered by Judge Nordbye and the sworn responses of Archie O. Williamson, a director of Patentee, manager of the road construc-

tion division and, in his own words, one "probably more familiar with the background and developments of" this patented machine "than any officer or other employee of the corporation." In answer to one paragraph of the order, this affidavit affirmed that the machine was displayed at the July 1948 "Road Show," and that it "did correspond substantially with the disclosure in U. S. Patent No. 2,610,557 * * *" subsequently applied for on November 17, 1949. Most important, par. No. 4 of the order required the Patentee to state under oath "whether [it] caused to be prepared and publicly distributed at the [July 1948] road show an advertising folder" in the form described in note 16, supra, a copy of which was attached. In the light of subsequent developments, a court might well conclude that there was a positive misrepresentation of the true facts. The affidavit stated that Patentee "did not cause to be prepared and publicly distributed" this brochure "at the [1948] road show." Rather, the affidavit continued, "Said folder was not prepared or distributed by defendant [Patentee] until long after said Road Show."

This first application was denied by a brief, unpublished per curiam order July 30, 1959. On August 26, 1959, a further application to recall and modify the mandate was filed. Attaching more affidavits of outside witnesses showing display of the machine and distribution of the brochure at the 1948 "Road Show", the most significant thing was the statement as to Williamson's pretrial deposition testi-

14. On July 11, 1959, the Texas Court in the instant case stayed the accounting ordered by us pending determination of these various applications by the 6th Circuit.

15. This was instituted by Browning Manufacturing Company and Shovel Supply Company, Inc., two Texas corporations. Each had been threatened by the Patentee with formal notices of infringement. See Bros Inc. v. Browning Mfg. Co. & Shovel Supply Co., 8 Cir., 1963, 317 F.2d 413, affirming the judgment of the District Court declaring the patent invalid (see note 25, infra).

16. The cover piece bore in large print "50 Ton Compactor with oscillating wheels" and identifying it with Bros manufacture. The back sheet had birds'-eye and profile sketches with and without hookup to a tractor. The inner pages had four photographs, two profile, one oblique, and one from rear end. Detailed specifications were printed between the pictures covering weight, capacity, weight loaded, tire size, body capacity, overall dimensions, etc. This sheet also stated "Price $12,500.00 f.o.b. Minneapolis, Minn."

This same brochure appears in our record as Defendant's Exhibit No. D.

mony in the Minnesota case. On the preceding day, August 25, 1959, so the application stated, Williamson finally testified that despite the categorical statement made in his earlier affidavits that the brochure was published "long after said road show," he now did not know whether it was printed before, during, or after the show. But the Patentee still disputed the July 1948 date. Just as it had earlier referred to the competing affidavits of Williamson and others, that "one of the two affiants is mistaken or is making a false statement under oath," the Patentee's responsive memoranda asserted that Williamson's testimony was being quoted out of context. The implication was plain of course: Williamson's affidavit fixing the publication long after July 1948 was the truth, the challenge false. The extensive memoranda briefs also covered, not only the factual dispute as to *time*, but the substantive significance of the brochure as a description of the invention under § 102(b). This application too was overruled October 1, 1959.[17] Application for reconsideration was then filed on October 8, 1959, and on the same date application was made to Judge Jones to stay the Ohio accounting proceedings. With no new factual information, but further memorandum argument and reargument, the 6th

Circuit denied this on November 13 on the basis of the order of October 1, with the further direction that "it is hereby ordered that the mandate of this court be complied with forthwith." On November 16, 1959, Judge Jones by an order briefly reciting these developments and stating "I can find neither basis nor power for this court to review what the Court of Appeals already has concluded" and "Rule 60 hardly is appropriate where the reviewing court has denied the same relief as is sought by the request here" denied application for stay and ordered the accounting proceedings to go forward at once.[18]

With things at an irretrievable end in Ohio, developments are confined to Texas and Minnesota. Lashing out in every and any forum open, the Infringer on December 10, 1959, filed in the Texas case a petition to reopen the former decree of February 17, 1958, sustaining validity and infringement and simultaneously opposed the proposed order appointing a Master to conduct the Texas accounting. These were a substantial rehash of the factual disclosures and contentions in the July-November 1959 applications made in the Ohio courts, together with current developments in the Minnesota litigation.[19] These motions

17. The brief unpublished per curiam described it as a "petition * * * to modify the mandate * * * based upon a claim of recently discovered evidence and appellee's [Patentee's] suspect oath and affidavit." The order recited that the Infringer claims that it "has obtained new and corroborative evidence of a printed advertisement and offer for sale" of the machine "more than a year prior to the filing of the application * * *." It then concluded, "In view of the availability of the claimed material in earlier proceedings, and our judgment that the additional affidavits fall short of a sufficiency to justify review, appellant's [Infringer's] motion for recall and modification of the mandate in this case is refused."

18. In the hearing before the Texas Master, the record of the Ohio Master's proceeding was expressly incorporated. Our record therefore reflects that the Ohio final judgment of October 17, 1961 (af-

firmed Wm. Bros Boiler & Mfg. Co. v. Gibson-Stewart Co., 6 Cir., 1963, 312 F. 2d 385) allowed $2,314.50 to the Patentee for "attorney's fees for the proceedings from July 1, 1959, through November 16, 1959." In response to questions at our bar, counsel for Infringer considers that further efforts to secure relief in the 6th Circuit or, by its leave, in the Ohio District Court, will subject it to the risk of additional court-imposed attorney's fees.

19. These papers charged that the Patentee "comes to this Court with unclean hands, through reliance upon a previous record made solely by a knowingly irresponsible witness * * *" and "seeking the Court's aid in consummating a constructive fraud." In concluding the motions, Infringer's counsel categorically recognized "the severe character of the * * * charges brought" by the motions which they did "not make * * * lightly or with pleasure," but out of a sense of responsible duty to have the case reopened.

were denied and the Texas accounting hearings proceeded. On December 21, 1961, the Master made his report. On March 9, 1962, the District Court, with modifications discussed in Part I confirmed the Master's report and entered final judgment for the Patentee against the Infringer.

Meanwhile, back in Minnesota, Judge Nordbye had on February 21, 1962,[20] held the patent invalid for prior publication for more than a year. Moving with characteristic tenacity, the Infringer then filed in the Texas case what it describes as its "motion * * * under Rule 59," March 19, 1962. This motion supported by annexed affidavit [21] and a copy of Judge Nordbye's opinion, though denominated as under Rule 59, was considerably broader.[22] In overruling it, Judge Davidson certainly treated it as the equivalent of one under 60(b) or an independent equitable proceeding.[23]

It winds up this extended history to summarize briefly Judge Nordbye's decision. Based on ours and the 6th Circuit's decisions, he sustained intrinsic validity as an invention. But as to prior publication he did two things. First he correctly pointed out that in view of their peculiar nature "the proceedings [to reopen the decrees on validity] in the Fifth and Sixth Circuits on this issue are of little, if any, weight in light of the complete trial * * * before this Court." Next, after an extensive review of the evidence, he held that "the entire record impels a finding that the pamphlet was distributed to a substantial number of people during the show in July, 1948, which was over a year prior to the application for the patent herein." He then examined the substantive content of the brochure and problems related to the display of the machine. Judge Nordbye categorically rejected the contention that the Patentee had abandoned the invention, or that the display with the brochure constituted either a "sale" or a "public use" more than a year prior to the application. 25 U.S.

20. Reported as Browning Mfg. Co. & Shovel Supply Co. v. Bros, Inc., D.C. Minn., 134 U.S.P.Q. 231.

21. The affidavit incorporated in some detail and by express reference all of the prior July-November 1959 developments in the 6th Circuit. It pointed out Williamson's earlier affidavit that the brochure "was not prepared or distributed * * * until long after said Road Show." As to this it stated flatly that in the Minnesota case, the Patentee was not "able to produce a shred of evidence in support of [this] affidavit statement" and that if "affiant Williamson" on behalf of Patentee "had not * * * denied" the distribution in 1948, the 6th Circuit "might well have reached a different conclusion."

The papers also showed the pendency in the Western District of Texas of Bros, Inc. v. Tampo Mfg. Co., C.A. 2860, San Antonio Division for infringement of the same patent.

22. The motion recited that the Infringer "respectfully move this Court, in accordance with * * * Rule 59 * * *, to alter or amend the Final Judgment entered * * * March 9, 1962, or, in the alternative, to open or suspend the same, with leave for application to the Court of Appeals to authorize reopening of the interlocutory judgment heretofore entered on February 17, 1958, for the purpose of granting a partial new trial devoted to the issue of statutory invalidity * * * by reason of prior * * * publication * * *."

23. In orally announcing his decision, after reviewing briefly the prior history of the case in this Circuit, the Judge stated: "The Circuit Court at New Orleans affirmed [Judge Atwell's] decision, therefore we have no discretion except to proceed under the decision as rendered by the Circuit Court, and that was to ascertain the amount of the damage." Elaborating further he went on, "We do not feel we should undertake to withhold any action had under the decision of the Fifth Circuit." But indicating that he was not passing on the intrinsic merits, he continued, "I think, however, the defendant [Infringer] has his remedy, and his remedy should be before that Court [Fifth Circuit] or before the Supreme Court * * *."

In the formal order of April 17, 1962, the order recited "It appearing to the Court that the partial new trial requested by defendant's [Infringer's] Motion is not a matter on which this Court should act at the present stage of the proceedings in this cause, but is rather one for consideration by the Court of Appeals for this Circuit on appeal * * *."

C.A. § 102(b). But after analyzing the brochure including the drawings and the photographs, he concluded that it sufficiently disclosed the invention to one skilled in the art.[24] Since it was a sufficient disclosure of the invention, even though not complete, Judge Nordbye concluded "that the patent must be declared invalid because it was described in a printed publication * * * more than a year prior" to the application.[25]

## V.

■ Like Mordecai at the Gate, the peculiar nature of the judgment entered by the Texas Federal Court must constantly be kept in view. That Court is not altogether as free as it might be (nor are we) had the judgment been rendered on the intrinsic merits. On principles of res judicata, it accepted, as it was bound to do, the adjudication of the Ohio court for the very same cause of action between the same parties.[26] Faced with the Ohio judgment, the Texas court had no right to then inquire into the merits, determine whether the Ohio judgment was correct, or ascertain whether the Ohio court would have rendered a different decision had the case been tried differently either on the law or facts.[27]

■ ■ What it could not do initially, it certainly has no greater right to do by reason of developments subsequent to the rendition of the decree based on the Ohio judgment. Restatement, Judg-

ments, § 1, Comment b. Consequently, it seems clear that, measured by the historic function of the motion for new trial under F.R.Civ.P. 59, the motion as thus denominated was ineffective.[28] No error was committed in denying it either impliedly or on its merits (or lack of them), or, more likely, out of deference to our mandate. (See notes 22, 23, supra).

## VI.

■ But it hardly stops there. The relief sought, that to be granted, or within the power of the Court to grant, should be determined by substance, not a label. F.R.Civ.P. 1. In this approach it is plain that the Infringer seeks equitable relief from a judgment which no longer should have legal effect. It does not matter too much whether the object is the Texas judgment which carries the local sanctions of injunction and substantial damages, or the more remote Ohio judgment upon which it is based.

■ Without examining at this moment the form or name of the procedural remedy, it is equally obvious that the mere fact that through the operation of res judicata a judgment has been entered based upon an earlier judgment does not alter the availability of relief if—and the if may be a big one—(a) parties are available and (b) controlling equitable principles are satisfied by the facts. As to this sort of direct attack,[29]

24. Cited was Trico Products Corp. v. Delman Corp., 8 Cir., 1950, 180 F.2d 529, 533; Application of Pappas, 1954, 214 F.2d 172, 41 C.C.P.A. 989. The 8th Circuit in affirming cited its recent opinion in Collins v. Owen, 8 Cir., 1962, 310 F.2d 884, 887.

25. We assiduously refrain from intimating any view as to the correctness of this holding since it rests, or may rest, on an evidential record which we have purposely not examined. Except to take note of it, we likewise refrain from attaching any significance to the 8th Circuit's affirmance since it is still subject to review on rehearing or certiorari. For our purposes we regard the Minnesota judgment as an historical fact independent of its intrinsic correctness.

26. Bros, Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1958, 261 F.2d 428.

27. We are here not speaking of an independent equitable proceeding attacking an earlier judgment of a foreign court. See Restatement, Judgments, § 114, comment d.

28. We need not discriminate between the judgment sustaining validity and the later money judgment since relief as to the former will encompass the latter.

29. See Restatement, Judgments, § 11, Comment a, " * * * the taking of independent proceedings in equity to prevent the enforcement of the judgment is a 'direct attack' as the term is used in" this Restatement.

a double judgment has no double immunity or double insulation. Two stand no better, no worse, than a single judgment. And, of course, as to a single judgment "A court exercising equitable jurisdiction can properly grant relief from any kind of judgment and against the judgment of any court." Restatement, Judgments, § 114.[30]

Although it is not likely that there would be a difference between the relief granted by an equity court in Texas, rather than in Ohio, since the judgments concern a matter controlled by Federal law (patents), we have to reckon again with the fact of the earlier Ohio judgment. For principles of conflicts as well as constitutional concepts of full faith and credit restrict the equitable relief granted by a "foreign" court to that which the "home" court would

grant.[31] Cf. Ford v. Ford, 1962, 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240.

### VII.

That brings us then to the particular remedy for this case. We reach two principal conclusions. First, the motions as made are the substantial equivalent of one under 60(b). Second, there is a sufficient probable showing of circumstances which, if finally sustained after proof and hearing, would justify some character of equitable relief.

Without undertaking here to evaluate the substantial criticisms urged by some, we may assume without now deciding what a number of other courts have held, that after an earlier appeal and the issuance of a mandate by a Court of Appeals, permission to file a 60(b) motion in the trial court must first be granted by the appellate court.[32] Since Judge

---

30. See Comment a. The equitable decree affects the parties, not the judgment. "Hence a court exercising equitable jurisdiction can give relief against a judgment rendered by any court in any State provided only that it has jurisdiction over the parties." Comment b, *Kinds of Judgments: Patents and Copyrights.* Despite exclusive federal jurisdiction to declare validity or invalidity of a patent " * * * a court of equity can exercise its control over persons although not over the subject matter of a judgment, equitable relief may be granted against the effects of a judgment declaring that a patent * * * is valid or invalid. The effect of granting a decree in such cases may be to prevent a person who has secured a patent * * * from using it as the basis of a claim or defense; it cannot, however, have the effect of preventing a person from establishing or contesting the validity of the patent * * *." See also in Comment a, "Thus, where a State court enjoins a patentee from enforcing an injunction against an alleged infringer, its judgment does not determine that the patent is valid or invalid, but only that, as between the parties, it was improperly obtained (see Comment b)."

31. See Restatement, Judgments, § 114, Comment d, "A State will give relief against a valid judgment rendered by a court in another State if and only if it would give relief against the domestic judgment similarly obtained." And

" * * * relief against a judgment of another State will be given only if the judgment would be subject to some form of relief in the State where rendered * * *." Apart from special statutes, see, e. g., 28 U.S.C.A. § 2283, this applies to state and federal courts. Comment e.

32. See Geuder Paeschke & Frey Co. v. Clark, 7 Cir., 1961, 288 F.2d 1, 85 A.L.R.2d 766, cert. denied, 1961, 368 U.S. 826, 82 S.Ct. 47, 7 L.Ed.2d 30; In re Potts, 1897, 166 U.S. 263, 17 S.Ct. 520, 41 L.Ed. 994; Butcher & Sherrerd v. Welsh, 3 Cir., 1953, 206 F.2d 259; Hazel-Atlas Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; and authorities collected in 7 Moore, Federal Practice, Par. 60.30(2), pp. 339, 340, Par. 60.42, pp. 907, 908 (2nd ed. 1955). But see the criticism summarized in 3 Barron & Holtzoff, Federal Practice & Procedure § 1332 (Wright ed. 1958). In Clark the 7th Circuit took this principle the next step to require leave to file an independent equitable proceeding. As a matter of intra-circuit judicial management, there is perhaps merit in this consistency, but since judgments are subject to independent equitable proceedings at the hands of any court having jurisdiction over the parties (see note 30, supra), a federal Court of Apeals may lack geographical power to protect its mandates.

608

Davidson deferred to this Court (see note 23, supra), nothing would be served by remanding this hoary case for him to consider this aspect only to have it return for us to reach the conclusion that the preliminary showing is sufficient.

In view of the express provision of Rule 60(b), it is not necessary to formally institute an independent equitable proceeding if relief can be granted under subparagraphs (1) through (6) of the Rule. In view of the one-year time limitation under 60(b) (2), we do not rest our decision on whether all of these papers constitute a showing of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b)." [33] Certainly, for the reasons we later discuss, bringing it within subsection (6), if not (3), this was assuredly new evidence having decisive impact depending only on the substantive legal interpretation of the contents of the publication. And on the present showing, especially the Williamson affidavit which as late as July 1959 denied categorically the July 1948 publication date, we would tentatively think that the Patentee is hardly in a position to urge want of due diligence.

Rule 60(b) (3) also has a one-year time limit. However, we purposely refrain from discussing this subsection separately because the materials suggesting fraud are presently too equivocal. At the same time we do not consider that it is altogether irrelevant in our consideration of relief under subsection (6) for "any other reason justifying relief." In connection with 60(b) which includes (6), subsection (3) has unusual importance in the policy declaration that for the purposes of this relief, fraud is without regard to whether it was "heretofore denominated intrinsic or extrinsic." In the light of the last sentence of 60(b), subsection (6) must mean to make available those grounds which equity has long recognized as a basis for relief. 3 Barron & Holtzoff, Federal Practice & Procedure §§ 1323, 1329 (Wright ed. 1958). In that approach the presence of 60(b) (3) in the Rules lends considerable strength to the view that there is little real basis for the distinction between extrinsic and intrinsic fraud [34] and in matters of such immediate importance to the administration of justice and the operation of the judicial mechanism, the conduct is to be tested by what it really is, what its effect must have been, and what must be done to eradicate it.[35] Certainly that was the

33. Following our analysis in Part V, we assume that the critical one-year period runs from "one year after the judgment * * * was entered" in the Ohio case. If for 60(b) the "final judgment, order" is the really final, final judgment of October 17, 1961, awarding infringement damages, attorney's fees, costs, etc., see note 18, supra, then the July-November 1959 motions earlier filed in the 6th Circuit asserting these very same contentions were timely (though perhaps premature) under 60(b) (2). If, however, the decree of December 16, 1957, sustaining validity and finding infringement, appealed under 28 U.S.C.A. § 1292(a) (4) and affirmed by the 6th Circuit is "final" as to this basic phase (cf. Restatement, Judgments, § 41, Comment c,) then 60(b) (2) is not available.

34. See 3 Barron & Holtzoff, Federal Practice & Procedure §§ 1326, 1331 (Wright ed. 1958), discussing also the opinion by Judge [now Justice] Brennan in Sham-

mas v. Shammas, 1952, 9 N.J. 321, 329–330, 88 A.2d 204, 208.

35. Section 126, Restatement, Judgments, itemizing equitable principles for relief states: "(2) Although a judgment is erroneous and inequitable, equitable relief will not be granted to a party thereto on the sole ground that * * * (b) the judgment was obtained by false or perjured testimony, production of false documents, or a conspiracy between the successful party and the witnesses * * *." But the 1948 supplement to the Restatement points out: "Recent decisions make it doubtful whether the Rule stated in subsection (2), Clause (b), would apply to the case of a judgment obtained by perjured testimony or the production of false documents if the perjured testimony or false documents had been knowingly procured by the successful party or his attorney." The explanatory notes state as the "Reason for the Change: the change is called for by the decisions in Hazel-Atlas Co. v.

approach in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.

## VIII.

██ On the question whether this calls for or even justifies equitable relief, we are of the view that the showing thus far is adequate for (a) this Court to grant leave to the District Court, (b) the District Court to undertake an appropriate hearing and (c) determine what relief, if any, is available or warranted. In so doing, we think this showing invokes 60(b) (6).[36] While the circumstances reflected by all of these papers bear many of the earmarks of a mere plea for reopening for newly discovered evidence under (2) or fraud under (3), it is something more. Cf. United States v. Karahalias, 2 Cir., 1953, 205 F.2d 331, on rehearing at 334.

When the July-November 1959 applications for stay, recall or modification of the mandate were made to the 6th Circuit, the Patentee, through its chief affiant Williamson, took the position that the brochure was not published "until long after" the 1948 "Road Show." More important, in response to the second application of August 26 in which the Infringer relied on Williamson's pretrial deposition testimony (that he really did not know the date), the Patentee by its answering memoranda asserted in trenchant terms that this was quoting Williamson out of context. The obvious implication was that the earlier affidavit continued as the truth. In the light of developments in the trial and judgment of the District Court in the Minnesota case, this was quite different from a litigant taking full advantage of a favorable fact finding inferred from arguably contradictory evidence. This was an effort, presumably successful, in an affirmative way to convince the 6th Circuit that the truth on this issue, not previously passed on by the Ohio District Court, was contrary to that asserted by the Infringer. More than that, this undertaking was pressed under circumstances which now raise doubt that such a position could fairly be maintained. From the viewpoint of the 6th Circuit, the papers may well have been treated as merely raising a *present* factual dispute as to *when* the brochure was published. That Court was certainly led into taking such a view by the responses made by the Patentee. Had the truth (as it now seems to be established if not acknowledged) of the July 1948 publication been made known, that Court might have taken a closer look at the substantive significance of the brochure alone or in connection with the display of the machinery.

Other factors bear heavily. One is time. Unlike so many equitable attacks, this began before any of the litigation anywhere was completed. The Ohio case was nowhere nearly over. The 6th Circuit's affirmance of the appealable decree of validity still left open the accounting which was not concluded until Judge Jones "final" final judgment of October 17, 1961. Likewise, when these same matters were asserted in the Texas court in July 1959 and again on December 10, 1959, that case was far from finished. Long before the Patentee was awarded a judgment for $52,000 (now increased twofold plus), the Texas court was told what has now become manifest through the Minnesota decision that the prior publication of the brochure would make the whole patent invalid and, if judicially sustained, the accounting proceedings entirely superfluous.

██ Another factor, perhaps of even greater importance, is the nature of this litigation. The issue is the validity of a patent. The public interest in a governmentally bestowed monopoly is of transcendent importance. This led us to an extraordinary action fifteen years ago

---

Hartford-Empire Co., 1944, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, and Sutter v. Esterly, 1945, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437. * * *."

36. See Klapprott v. United States, 1949, 335 U.S. 601, 614–615, 69 S.Ct. 384, 93 L.Ed. 266; 3 Barron & Holtzoff, Federal Practice & Procedure § 1330 (Wright ed. 1958).

when, in response to a petition for rehearing after the announcement of our earlier opinion, we suspended our mandate and referred back to the District Court a part of the case for further evidence and findings. Zachos v. Sherman-Williams Co., 5 Cir., 1948, 166 F.2d 79, and after recertification, 177 F.2d 762. There we pointed out "A patent is a monopoly granted by the public and is of public interest, and ought to exist against all or none." This may be of unique significance here for the papers show that the Minnesota plaintiffs are Texas concerns, and another infringement suit brought by the Patentee remains untried in San Antonio. Granted that the concept of a "case or controversy" between specific litigants allows for the possibility of diverse results as to the same patent, and that with the autonomy of each of the eleven Circuits, a similar result may occur nationwide,[37] the result is something less than satisfactory. Another distinguishing element would make such a result in this case more than ordinarily unsatisfactory. If the claim of prior publication is sustained as it was in the Minnesota case, there is a basic statutory infirmity. It is not, therefore, the more routine case in which validity or invalidity turns on intricate evidentiary questions of prior art, anticipation, lack of invention, novelty, or the like.

■ Another significant factor, related in a way to that of timing, is that so far no rights of intervening third parties have been affected by the present judgment. The only parties affected are the Patentee and the Infringer. The injunction has kept the Infringer from further infringing, and the main appeal here concerns only the question of damages. While this award of damages sounds in the past, rather than the future, no judgment has yet been paid, and

in practical effect we are dealing with the prospective application of the judgment, not the unscrambling of the past. Relief may be available for this. Cf. F.R.Civ.P. 60(b) (5); Restatement, Judgments § 125; 3 Barron & Holtzoff, Federal Practice & Procedure § 1328.1. (Wright ed. 1958).

■ The policy of finality is, and should be, strong. But in the face of these unusual factors, we think that equitable principles encompassed within 60(b) (6) justify further inquiry.

*IX.*

■ While we conclude a hearing should be had, we do not by any means suggest that the present equities are all in favor of the Infringer. After years and years of litigation, the Patentee has as yet to realize the fruits of the judgment which, as modified, we affirm. In remanding the case to permit hearing and determination of this limited matter under 60(b), we do not think that enforcement of the judgment should be stayed. By its provision that the Court may relieve a party "[o]n motion and upon such terms as are just," and the provision that such a motion "does not affect the finality of a judgment or suspend its operation," Rule 60(b) envisages that the Court has a wide discretion. Since the Infringer's briefs on the main appeal indicate that the issuance of the permanent injunction has not had a significant effect upon its manufacturing and sales operations, and the matter now remaining is a money judgment, we do not think a stay is required pending final determination of the 60(b) hearing.[38] The Infringer is, of course, entitled to protection. But it will have sufficient protection by the conditions which we hereby impose. These conditions are that the Patentee, by obtaining satisfaction of the money judgment (in whole or

---

37. See, e. g., Expanded Metal Co. v. Bradford, 1909, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034; Abercrombie & Fitch v. Baldwin, 1917, 245 U.S. 198, 38 S.Ct. 104, 62 L.Ed. 240; Diamond Rubber Co. v. Consolidated Rubber Fire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

38. Establishing this broad guide line, we do not mean to foreclose such protective orders as the Court in its considered discretion deems reasonably required to meet subsequent, extraordinary developments.

part) by payment or execution, or both, expressly recognizes that it is subject to the orders of the District Court in Texas to effect such restitution as may be required by the decrees or orders in the 60(b) proceeding. See Restatement, Judgment §§ 44, 125, Comment *e.* Such conditions are not imposed nor intended as a restriction, in any degree, of the right of either one or both parties to appeal from any such orders. The purpose, rather, is to make certain that since the Patentee is not to be further delayed in the enjoyment of its money judgment, the Infringer, on the other hand, is to have the effective advantage of any 60(b) orders and restitution occasioned by them without the necessity of commencing yet another suit in another district in another circuit.

We should also emphasize that nothing said or unsaid, expressed or implied, is either a holding or even an intimation of the decision to be reached by the District Court or this Court as to the limited matters remanded for further hearing. The facts finally proved may show there is no basis for equitable relief. That question, as well as all others, including the intrinsic question of the time of the publication and its substantive legal significance, if any, are for the District Court in the first instance, unaffected by what we have said in appraising the sufficiency of them as a showing or by what the Minnesota Court has done in a case involving different parties. By virtue of our intercircuit federal federalism, these parties to the Texas litigation are entitled to the independent judgment of the Texas District Court and review by this Court. It is far too early to foretell whether, on the merits, the Texas District Court or this Court would or would not agree with the Minnesota Court, or now, the 8th Circuit.

Affirmed as modified on the main appeal.

Reversed and remanded on the cross appeal.

CAMERON, Circuit Judge, concurs in the result.